## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 29 2016, 8:38 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS

Andrew J. Sickmann
Boston Bever Klinge Cross & Chidester
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E Corey
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of A.C., C.C., N.C., Sk.C., Sa.C., Sh.C., & E.F. (Minor Children)

and

F.F. (Mother) and S.C. (Father),

*Appellants-Respondents*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

January 29, 2016

Court of Appeals Case No.
89A01-1505-JT-430

Appeal from the Wayne Superior Court

The Honorable Darrin M. Dolehanty, Judge

The Honorable Matthew R. Cox, Judge Pro Tempore

Trial Court Cause Nos.
89D03-1501-JT-5
89D03-1501-JT-6
89D03-1501-JT-7
89D03-1501-JT-8
89D03-1501-JT-9

**Mathias, Judge.**

The Wayne Superior Court terminated Mother's and Father's parental rights to seven of their children. Mother and Father appeal and argue that the trial court's order terminating their parental rights is not supported by sufficient evidence.

We affirm.

## Facts and Procedural History

Mother and Father had seven of their fourteen children in their care in October Mother was also pregnant with their fifteenth child. As a result of a complaint, Richmond police officers were called to parents' home. Mother was in the home with seven children, but Father was incarcerated for resisting law enforcement and contempt for failure to pay child support for his two other children [with another woman].

When the officers arrived at parents' home, it was cluttered and filthy. Food was rotten, the refrigerator was broken, and electrical wires were exposed. An

_____

[1] One of Mother's and Father's children died in 2008. Mother also has four children from a prior relationship. She has not resided with these children since 2000. Father has two children from a prior relationship.

upstairs bathroom had "feces piled in it," and the house was full of bugs and cockroaches. Tr. p. 7. One of the children was in a portable playpen, which was crawling with bugs. When the child's diaper was changed, bugs had to be shaken out of it. Extension cords ran throughout the house, and electricity was being wired in from the house next door. Finally, three of the seven children had head lice.

[5] Because of the unsanitary condition of the home, the Department of Child Services ("DCS") removed the children and filed a petition alleging that the children were children in need of services ("CHINS"). The children are C.C., born on February 18, 2003; N.C., born on March 16, 2005; Sk.C., born on February 9, 2006; Sa.C., born on September 25, 2007; Sh.C., born on October 4, 2009; A.C., born on February 27, 2011; and E.F., born on June 6, 2012.

[6] The petition alleged that each child's "physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent(s) . . . to supply the child with necessary food, clothing, shelter, medial care, education or supervision." Appellant's App. p. 65. The DCS specifically alleged that police officers had been called to the home because of a report that mother had threatened to harm the children. The DCS alleged that the home was uninhabitable and the children were infested with lice, appeared dirty, and were not dressed in size-appropriate clothing. Further, the DCS noted that Father was incarcerated.

[7] Mother and Father admitted that the allegations in the petition were true at an initial hearing held on October 16, 2013, and each child was adjudicated a CHINS. The children were placed in foster care where they have remained throughout these proceedings.

[8] Parents also have a history with the DCS beyond the case before us. Their children were removed from them in 2008 and 2012. The DCS provided many of the same services to the parents in those two incidents that were provided in these proceedings, including counseling, individual therapy, family therapy, and financial assistance with rent, utilities, and groceries.

[9] Mother and Father were generally compliant with the services provided by DCS. Mother participated in counseling, home-based parenting instruction, and homemaker services. After he was released from incarceration in May 2014, Father was generally compliant with services as well. However, in September 2014, he tested positive for cocaine twice.

[10] The parents moved into a different home shortly after the children were removed, and they remained in that home throughout these proceedings. Father obtained employment at a factory a few months after he was released from incarceration, but the factory closed in December 2014. Mother, who has epilepsy, filed for disability, and her claim is pending.

[11] The parents' fifteenth child was born in January 2014. That child has remained in parents' care. Mother has kept the family residence clean and tidy. She also complied with her therapy goals. Mother has benefited from therapy, and she

generally interacts well with the children. The parents also participated in family therapy. Father struggles with controlling his temper, and visitation supervisors occasionally were required to intervene when Father became angry with the children.

[12] The parents did have unsupervised visitation for a period of time. During unsupervised visitation in July 2014, an incident of inappropriate sexualized behavior between two of the children occurred. Father failed to immediately report these incidents to the family case manager but did so sometime later. Father said he talked to the children about it, but he did not know what to do. Tr. p. 146. Another incident with the same two children in October 2014 was reported to the DCS by one of the foster parents.

[13] After the October 2014 incident, the parents' visitation with the children returned to supervised. Although the visits generally went well, the parents still required prompting to utilize their coping skills and act appropriately during visitations. Mother "has done very well and she's actually learned to be . . . able to be a bit more bonded. She had a hard time showing affection" but has "learned a little bit better how to do that." Tr. p. 152. Father "is very kind and sweet with the kids. Unfortunately if they misbehave in the wrong way, then [Father's] temper sometimes gets the best of him[.]" *Id.*

[14] On January 21, 2015, the DCS filed petitions to terminate parents' rights to the seven children adjudicated as CHINS. Shortly thereafter, Father was hired

through a temp agency to work part-time at a pet food company at a rate of $9.50 per hour.

[15] A fact-finding hearing was held on April 21, 2015. On this date, the parents were facing eviction for non-payment of rent. They planned on moving to a two-bedroom trailer with a more affordable rent payment.

[16] In May 2015, the trial court issued an order granting the DCS's petitions to terminate Mother's and Father's parental rights to the children. In its order, the trial court found in pertinent part:

> 14. Leslie Rogers was employed by the DCS in 2013 and 2014. From November, 2013, through October 2014, Ms. Rogers was the DCS case manager (FCM) for [Mother, Father] and their children. She assisted the family with accessing services, including case management, therapy, and supervised visits. The "case management" services included assistance in finding employment, [Mother's] filing for disability relief, and searching for adequate housing. [Mother] was compliant with the services supervised by FCM Rogers.

> 15. Amy Izod, a Family Support Specialist from Centerstone, provided services for [Mother, Father] and the children. She provided "life skills" and "coping skills" therapy for some of the children; and "parenting" and "interpersonal relations" therapy for the parents. At some point in 2013 or 2014, Ms. Izod went to the family's home. She observed that the children were using "pallets," which she described as piles of blankets, for their bedding. She also observed that the house did not have its own electricity and extension cords were running from another house. She saw that some of the children had lice and that there were roaches in the home. She described the house as "as tidy as it could be."

16. Julie Phillips, a Family Consultant from Lifeline, has worked with the family since October, 2013. [Mother] and [Father] were both compliant with the services supervised by Ms. Phillips. Her involvement with the family concluded when services were switched from Lifeline to Meridian Services.

17. Rodney Barbee, a case manager from the Children's Bureau, has worked with [Father] since October 2013, in the Father Engagement program. While [Father] was incarcerated, he worked with Mr. Barbee on self-care, and on preparing to meet demands outside of incarceration, such as parenting, providing for his family, job searches and job skills. [Father] has been cooperative with Mr. Barbee's services and keeps his appointments.

18. Mike Wilkinson, a therapist from Lifeline, started working with [Mother] in November, 2013. The treatment goals were to get her to use local support services, not to be angry around the children, stress management, to identify her own emotions, and to develop coping skills. He found [Mother] to have "trust issues" which he attributed to prior involvement with government officials dating back to the death of one of her children, several years prior. Mr. Wilkinson later worked with all of the family members through "Family Centered Treatment" and helped supervise visits between the parents and children. He worked with the family from November 2013, through July, 2014. The Family Centered Treatment services started in April, 2014, and were expected to continue for 6-8 months. His services with the family were terminated by the DCS, when the children were moved to different foster homes in July, 2014. At that point, the family had only progressed through phase one (1) of the four phase program. [Mother and Father] were both compliant with Mr. Wilkinson's services, although he observed [Father] lose his temper, yelling and cussing, during one of the first visits after his release from incarceration. Additionally, [Father] missed some visitation sessions due to work obligations. Mr. Wilkinson's

service efforts were made more difficult to administer due to the fact that some of the children were placed in a foster home in Laurel (Franklin County) and others in Connersville (Fayette County). A good deal of time was spent on transportation alone.

19. Laura Jackson, a Behavioral Clinician with Meridian Services, worked with the family at some point after the children had been removed. She assisted with supervising visits between the parents and children. When visits were in the family's new home, she noted that the home was picked up, clean, no dishes were piled up, the home did not smell, there were no bugs, and the house had its own electricity service. Ms. Jackson had a few "uncomfortable" interactions with [Father], during various visits.

\*\*\*

21. Periodic Review Hearing was held in each CHINS case on April 16, 2014. The Review Order was entered on April 17, 2014. . . . The children remained in foster care. [Father] was still incarcerated, but had started "Engaging Fathers" classes. The Court found that the parents were complying with the case plans. The CHINS Court noted that when the children had been removed by the DCS on two prior occasions, 2008 and 2012, that the children had been returned after approximately seven months each time.

22. [Father] was released from incarceration in May 2014.

\*\*\*

25. Renee Morris, also a Behavioral Clinician with Meridian Services, was also involved in supervising visits for this family, from August through the end of December, 2014. Four children had visits on Thursdays, and the other three children had visits

on Fridays. The entire sibling group was together only for Thanksgiving and Christmas. Ms. Morris observed [Father] get upset, yell, and walk away on four or five occasions. [Father] was consistent in visiting with the children, other than when he had work or interviews for work. He also missed one visit due to being in a bicycle wreck. Ms. Morris accompanied [Mother] to a disability determination hearing in March, 2015. No determination was made.

26. A Permanency Plan Hearing was held in each CHINS case on October 8, 2014. The Permanency Plan and Review Hearing Order was entered on October 11, 2014. [] The Court specifically found that [Father] had tested positive for cocaine use on September 4 and 10, 2014. [Mother] was found to be making progress in implementing parenting skills. [Father] had been supporting the discipline implemented by [Mother], and had recently obtained employment. The parents were visiting with the children and were cooperative with services. Regarding alleviation of the causes for the original removal of the children, the Court specifically found, with regard to child [A.C.], that "the parents are improving their ability to care for the child. However, this is the third time the child has been removed from the home and the parents need to have sufficient income, housing and parenting skills so the child is not removed in the future." Returned to the parents' home was projected for December 23, 2014, contingent on the parents' ability to maintain income and housing.

30. [Father] and [Mother] are currently living on South 7th Street. They plan to move to a new trailer on New Paris Pike, also in Richmond. They are leaving the South 7th Street home due to failure to pay rent. Ms. Morris, from Meridian Services, has visited the trailer to which the parents plan to relocate. She described the trailer as having two bedrooms and being "in their budget," which she described as $500 per month for housing.

32. [Father] is currently working, part-time, at Hill's Pet Nutrition in Richmond, and has been there for approximately three months. He rides his bicycle back and forth to work, even in cold weather. He is placed at Hill's through a temp service and earns $9.50 per hour. His wages are garnished for delinquent support obligations.

33. The DCS has provided over $285,000 in services for this family, in the course of the ongoing CHINS cases.

34. [C.C.] is in a foster home of his own. He is doing well, enjoys the guitar and karate lessons, and is succeeding in school.

35. [N.C., Sk.C. and Sa.C.] reside in a different foster home. [N.C.] is quiet and shy, while [Sk.C.] has become the "class clown." [Sa.C.] is doing well.

36. [A.C.] is in his own foster home.

37. [S.C. and E.F.] are in a fourth foster home.

38. Each of the current foster placements is considered as a viable adoption candidate.

39. Each of the children continues to receive individualized services while in foster placement.

Appellant's App. pp. 67-70.

[17]  The trial court then concluded that Father "has worked hard to maintain employment, but has not had much success in that regard. He recently lost one job, and has been placed through a temp agency at a local pet food producer, where he earns part-time wages of $9.50 per hour." *Id*. at 70.

> Since these children were removed, the parents have, for the most part, cooperated with services. Their house has been clean, when visited. However, the parents have not been able to maintain stable housing, and the original reason for removal of the children has not been alleviated. Despite financial and other forms of public assistance, the parents have not met their rent obligations, and are relocating to a two-bedroom trailer. While the Court was not provided with evidence regarding the size of the trailer's room, it is reasonable to assume that the new residence is of insufficient space for eight children and two adults. The children have been removed from their parents for over eighteen (18) months, and the parents are in no better of a position to provide safe and suitable shelter, as they were on the date of removal.

*Id*. Therefore, the court concluded that "there is a reasonable probability that the conditions that resulted in the children's removal and placement outside of the home of the parents will not be remedied" because the parents remain unable to provide safe, clean and stable housing for the children. *Id.* The parents now appeal.

## Standard of Review

[18]  We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We

consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

## Discussion and Decision

[19] "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

[20] Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

> (2) The petition must allege:
>
> > (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[21] The DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parents is wholly inadequate for the child's very survival. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.* If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[22] Here, the trial court concluded that "there is a reasonable probability that the conditions that resulted in the children's removal and placement outside of the home of the parents will not be remedied" because the parents remain unable to

provide safe, clean and stable housing for the children. Appellant's App. p. 70. When we review a determination that a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, we apply a two-step analysis:

> First, we identify the conditions that led to removal; and second, we "determine whether there is a reasonable probability that those conditions will not be remedied." In the second step, the trial court must judge a parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions," balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014) (internal citations and footnote omitted).

[23] Mother and Father argue that the trial court's conclusion is not supported by the evidence and that their rights were terminated because they "live below the poverty line." *See* Appellants' Br. at 9. In support of their argument, Mother and Father cite to evidence that they were compliant with the services offered by the DCS, that Father was employed, Mother was awaiting the outcome of a disability determination, and that their home was clean throughout the proceedings.

[24] On the date of the termination hearing, the parents were being evicted from their current home because they were unable to afford the rent. They found a two-bedroom trailer to rent that they could afford. However, it was reasonable for the trial court to infer that "the new residence is of insufficient space for eight children and two adults." *See* Appellant's App. p. 70. Moreover, when the children were removed from the parents' care, they were sleeping on piles of blankets on the floor. No evidence in the record indicates that the parents currently have appropriate beds or furniture for the seven children who are no longer in their care.

[25] The parents hope to improve their ability to provide a stable home for the children in the future, if Mother's disability application is approved and if Father can maintain stable employment. However, it was more than appropriate for the trial court to consider Mother's prior unsuccessful application for disability and Father's three prior incarcerations and unstable employment history. Father obtained a full-time position shortly after he was released from incarceration in May 2014, but the factory closed a few months after he was hired. Father was then unemployed for several weeks before he was hired for a part-time job at Hill's Pet Nutrition. Moreover, his wages are garnished for the $3,000 in back child support he owes to his two children from a prior relationship.

[26] Mother struggles to function without Father, which is evident from the state of their home when the children were removed in October 2013 while Father was incarcerated. The trial court reasonably considered Father's history of

incarceration and his "anger" issues when it determined that the conditions that resulted in the children's removal would not be remedied. Moreover, while both parents participated in services, their progress was limited. Mother and Father required coaching and prompting to act appropriately during team meetings and supervised visitation with the children.

[27] These children have been removed from parents' care for a total of fourteen months under prior CHINS adjudications and approximately eighteen months between the date of removal and the date of the termination hearing in these proceedings. They have waited long enough for a stable home. Mother and Father have not been able to provide that stability for the seven children removed from their care and have not demonstrated that they have the ability to financially support their family.[2]

[28] For all of these reasons, we conclude that the evidence was sufficient to support the trial court's finding that "there is a reasonable probability that the conditions that resulted in the children's removal and placement outside of the home of the parents will not be remedied" because the parents remain unable to provide safe, appropriate and stable housing for their seven children. Appellant's App. p. 70. This is the only issue that Mother and Father challenge

---

[2] During the termination proceedings, the DCS was inappropriately focused on the services and expenditures it had made on behalf of this family totaling $285,000. The amount the agency expends on assisting parents and children with the goal of reunifying the family is not relevant to the inquiry of whether the parents' rights to their children should be terminated.

on appeal, and therefore, we affirm the trial court's termination of their parental rights to C.C., N.C., Sk.C., Sa.C., Sh.C., A.C., and E.F.

[29]     Affirmed.


Kirsch, J., and Brown, J., concur.